Please proceed. Good morning. Good morning, Your Honors. May it please the Court, my name is Kyle Norderhaug, and I represent appellant Tanya Rosenberg. I'd like to reserve five minutes for my rebuttal. All right. We begin with this case where we must, under California law, that appellant is presumed to be non-exempt. That this is a required presumption by California law. It's important. It has important policy reasons behind it for the health and welfare of employees. And I want to make clear, we're not contesting to the extent there's an FLSA or a Fair Labor Standards Act issue under federal law. We're not contesting that under appeal. What we're contesting is California law under the California Labor Code, and specifically the application of the professional exemption, which is the affirmative defense borne by the employer. And the finding by the district court that that was established as a matter of law on summary judgment. This is a summary judgment grant. And I think it's important here to put, my client was a registered dietitian. It's important to put that in context here, because registered dietitians are essentially, they assist. Counsel, what factual information did the district judge get wrong? What the district court got wrong was it failed to consider some of our evidence. For example, the district court mentioned about the job description. Eighty-five percent of what the registered dietitian did is in these four main responsibilities. So we have the first one, providing patient education. Well, that sounds pretty sophisticated until you look at our evidence. And our evidence was that meant handing the employer's handout to the patient. So it's a pre-made handout prepared by the appellee that my client isn't involved in preparing. They hand it to them. Then we got assessing patient's nutritional statuses. Well, it turns out there's a template prepared by the employer. Certain lab test results are inputted in there. And a diet order is prepared. It's the same diet order. In fact, my client explains, it's the same diet order day in and day out. They only help stage three renal patients. It's the same diet. They're not developing anything new. They're not formulating policies. When you break it down, these are flowery terms for mundane, routine tasks performed. So they get to decide ultimately sometimes without the assistance of the doctor how they construe that dietary plan, correct? No. There is an established framework. If your magnesium is too high, then you do this into the diet order. And then the physician at all times sees the diet order and signs off on it. So the patient's both constrained by the company policies and the doctor's orders. And I'll tell you, this is a quote from the company's policies. Registered dietitians are prohibited from accepting, writing, transcribing, or altering patient medication orders. Patient registered dietitians may enter diet orders in the electronic medical records per physician's orders. And that's a quote. This is essentially a nurse that's involved in diet that is executing orders from the patient or from the physician along company policies, according to company policies. She can't choose between bananas and apples? Your Honor, if people are exempt... Excuse me for answering yes or no. Can she choose the particular food that she recommends and gets approval by the doctor? Yes. She can recommend particular dietary foods. I'm sure there are foods that they want certain renal patients to eat. It's the same foods every time, because the renal insufficient patients have the same type of deficiencies that need to be addressed through diet. And weren't there several dietitians who had significant authority to decide those dietary plans? All of them have the same authority. I mean, that gets to the class certification issue. And, you know, I view it as we don't really get to the class certification issue unless my client has her day in court on the questions of fact that we think are disputed in our material. So, you know, I concern myself primarily with my client. I feel, though, however, these same policies and rules and constraints of both the business and professions code, the doctor's instructions, and the company policies do apply to other... The problem, counsel, my notes indicate Rosenberg testified that before she told the patients about their diet plans, she developed. She did not need to seek anyone else's approval, but rather use her training and knowledge to follow the renal standards of practice. So she initiated the choice of the particular foods which would be on the diet order. The doctor had to approve them. But she used her individual training, if I got her right, to choose the foods. And that gets me back to what is that training? It's in-house training. They take these employees. They take them through a renal training plan. Here's what you do. We've put that into evidence. It was, well, I don't have it directly here, but it's a comprehensive dietician and training orientation, and that's ER 1376. That's what they do. You know, it provides all the detail that's necessary for there to perform. It's not that she had this prolonged educational, like a doctor, where you... How does the fact that the training for her profession is done by her employer change the status of whether she is a professional, and therefore... Does it make a difference whether the training is done by the employer, the Internet, or UCLA? It does, Your Honor, because that's the professional exemption. The professional exemption is she's performing duties primarily from a prolonged source of academic instruction. So that's a medical degree. Registered nurses, they get a college degree, and then they have a nursing school. That's still not considered to be a professional exempt individual. I forgot where I put my slide here. I apologize. Counsel, but if a lawyer goes to a CLE that's sponsored by the Bar Association, are you saying that there's a distinction between that situation and what you've just described? There is, in that, imagine he didn't have the law degree, got a bachelor's, then got the CLE certificate and said, I can practice law in this narrow field now. But doesn't have the law degree. See, this person doesn't have a medical degree. This person has a bachelor's degree, and then takes essentially, as you said, like a CLE course. It's a vocational course. I think it's six months or something like that. It's not a prolonged academic professional degree. And even in that, that's a general dietary course. It's not what she's using in performing her duties now. What she's using in performing her duties now are the in-house training that she went through to treat renal patients according to how the employer wants them treated. You have about five minutes. I'll reserve my time. I thank you. Good morning. David Stern, Hughes, Hubbard, and Reed for Appellee Renal Advantage Incorporated. With me, my colleague, Carolyn Sahimi. May it please the Court, since counsel has spent his time addressing only the summary judgment issue, I'll address that first, and I'll talk briefly about the class certification issue, Your Honor. A couple things to correct right away. Dietitians only can become a dietitian after a prolonged course of study. They have a BA in dietetics. Your Honor asked a question about continuing legal education. They must submit to 75 hours of continuing legal education over five years. That's more, I submit, than the California, our rules, that governs attorney conduct. So it's significant. There's a prolonged course of study, there's a prolonged course of intellectual study, and she engaged in that. She had a BA in dietetics. She also had an internship and two years of field study before coming onto the position with renal advantage. That's very important, Your Honor. In fact, I think that's critically important. Counsel said it's stage three kidney disease. There's no reference to stage three kidney disease. It's stage five kidney disease. All these patients have end-stage renal disease. They're critically ill people. There's a lot of comorbidities. There's diabetes generally, hypertension. This is in the record. They may have anemia. They may be suffering from cancer. The dietitian needs to use their background, skill, and training to make recommendations and counsel and educate the patients on what foods to choose and what diet to choose. There's also an issue of, I think, I'll call conflating the diet order with the diet plan. Frequently, physicians will set a diet order, which would be a range of total caloric intake, potassium levels, sodium level. The diet plan is left up to the discretion of the dietitian, in particular Ms. Rosenberg here. That's the evidence. So what the trial court did on summary judgment, they took the job description, and it wasn't controverted by appellant. It was uncontroverted. They took that, and then they also looked at what she did in the field as a day-to-day dietitian. She worked largely unconstrained from supervision. She wasn't under decisions where she had to report to the physician all the time. In fact, there would be months' period of time when she would not interact with the physician. She used her skill, her training, and her expertise to develop diet plans, to counsel patients, to educate patients. She even submitted a letter with other dietitians to the company, saying what I do is essentially a master's degree, and it helps physicians, and I can make certain determinations. I think it shows a great level of sophistication. And to say that it's not, I think it's disingenuous, frankly, and it's not belied by the record. I also want to point out to the Court's attention, since we submitted our briefing, I think it was about a year ago, there's been a couple of decisions by this Court. They deal with the administrative exemption, but both cases involve appellant's counsel. And I'll reference them. One is Gallardo. Are those in your brief? No, Your Honor, they're not in our brief. Did you send a 28-J letter? No, we did not, Your Honor. If you will, I can give a citation right now. Okay. The important point, I think, is there's been two panel decisions in the last year after our briefing was submitted. It's appellant's counsel. It deals with the administrative exemption, but it affirmed awards of summary judgment where factual records were not unlike here. And in Gallardo, how the employee spent the time working is a fact question reviewed for clear error. And then the legal conclusion is reviewed de novo. And I think what we have here is a very clear factual record. There's no declarations that try to controvert her deposition testimony. She agreed that the job description, her duties were consistent with the job description, and then she testified at great length to the autonomy she had and the independence she had as a dietician. So I submit at this point in time, Your Honor, that the court was well within its authority to grant summary judgment in our favor. Well, I thought I heard your opponent, Mr. Nordhoff, say that she really couldn't make diet decisions without the approval of a doctor. I submit, Judge Boehner, that's absolutely incorrect and not borne by the record. She certainly could and did. You asked a question, I believe, on a banana or apple. She could make diet recommendations, diet, she could counsel the patient on the dietary plan, the foods that the patient should consume or may want to avoid. It didn't need to go to the doctor for that. But didn't the diet order always have to be signed off by the doctor? Not necessarily true. The diet order generally was signed off by the doctor, but with respect to her, I think she testified that the diet order was signed off. But again, the distinction between the diet order and the plan, I think, is critically important. The diet order is just something, this is the patient, this is the range I want that patient to be in. There are guidelines. They can waiver from that, but when you go down to the dietician, they have the autonomy and the skill set to recommend a diet plan for that individual. And the analogy of the nurse I wholly don't understand, Your Honor. In fact, nurses, as we've pointed out in the Reeve case, are exempt under the FLSA. The only reason they're not under California law and the 4-2001 wage order is because there was a conscientious effort made by the legislature to say that nurses and I believe pharmacists are not exempt. As the court's aware, the IWC was defunded. There's been nothing about dieticians. The legislature has not spoken on dieticians. They're really advocating for this court to take the position that the legislature meant something else about dieticians. There's no record evidence for that. So if I understand you correctly, the overall food that the patient eats, step one is for the local doctor to approve a diet order, which is in general planned as far as what minerals and other components the patient should get. And then a diet plan is done by the dietician to select the particular foods which fit into the requirements of the diet order. Is that correct? The diet order is just total caloric intake, total sodium level, things of that nature. The diet plan is the plan for that individual developed by the dietician. The doctor doesn't develop the diet plan. I think most of us know going to the doctor, that's really not within the time and what they do. So the diet plan was developed by Ms. Rosenberg here. And she had to know what foods contained what minerals and what other components that are listed and what calories that are listed on the diet order. And that's right, and it's not just that. She also has to take into account all these other factors, these other comorbidities, how various medications may interact. It's a very fluid situation. It's not something that's static. And I think they try to trivialize it. And if you look back behind the curtain, if you will, you look at the record evidence, that's not the case at all. It's a very dynamic, very fluid situation that involves someone. Otherwise anyone could be a dietician. We could all do it. We could hand out a card. That's not what the record evidence is. That may be the theory that was espoused, but when you pull it back and you look at it, that's not what happens. And that's not how the field works. But you're up against a portion of summary judgment standard, which means they have to take the evidence submitted by the plaintiff and give it all intendance in her favor and find that there's no material issue of fact as to the application of the exemption. You believe that that's the case here? Absolutely, Judge Bader. I don't think there's any material fact question that would prohibit, and I think the district court got it right when they ruled, and I think case law in this circuit is consistent. If you look at some of the other cases, distinguish their cases. The one case they said is Bothell. It was a case where a guy was not unconstrained. He had constant interaction with a supervisor and was not free to make decisions, choices. The other cases, whether you look at the Powell case or the Owsley case out of the Fifth Circuit, where there's athletic trainers, there's guidelines, the important thing, the touchstone was they had independence. They had the ability to make recommendations, make decisions, counsel. That's what happened here, and that's what the record, I think, supports and demonstrates. Now, Ms. Rosenberg presented, as part of her evidence on motion of summary judgment, an expert who concluded that the registered dietitians employed by your client have, quote, no autonomy. Doesn't that raise an issue of material issue of fact? I'm sorry, you're referring to the conclusion Ms. Berkowitz, I think you're referring to? And, Judge Bader, what was the? The conclusion was that the registered dietitians did not indeed have any autonomy. Well, I can, it's in the record, and I took Ms. Berkowitz's deposition, and I'll start off saying she'd never been in a dialysis facility. She really didn't know what a registered dietitian did in the dialysis setting. So her statement is not borne out. It's a conclusory statement, and it's not borne out by what they actually did. She did have autonomy. She didn't know what she did, frankly. So I don't, otherwise you could just get some expert, or so-called expert, to state something that they have no autonomy, and that would defeat summary judgment. I don't think that's the case. So your position is that Ms. Berkowitz didn't testify to any material fact? Yes, Your Honor. That's correct. She testified to no material fact. Thank you. And just briefly, I have a few minutes remaining, I believe, and I want to just briefly address the class certification portion of it, which this Court reviews under abusive discretion standard, and I think it would be an abuse of discretion had the district court just relied, as the plaintiffs say, or as Ms. Rosenberg says, on the uniform policies to the near exclusion of other relevant factors which touch on predominance. And this was this Court's decision in 2009 in Wells Fargo, and in all of its progeny, Vinol, DeLotta Aerotech, Marlow UPS, you always have to look and drill down and see what the people are doing. It's not enough to just rely on a uniform policy. And there was diversity here, there were variances in what people did, and under Dukes and the misclassification cases out of this circuit, you can't just rely on a uniform policy and that's not enough. You have to do a facts-intensive inquiry and see what people are actually doing. And I think the district court was absolutely correct in its motion to deny class certification. I don't think there's any dispute about that. In fact, the cases that are cited by the appellant are wage and hour cases, which I distinguish from misclassification cases where there may be a policy of no meal break. They rely on those type of cases. They don't rely, importantly, on misclassification cases. So I think for all the factors, and there were a number of factors the district court found, failure of predominance, commonality issues, inadequacy issue, etypica. All of that is supported by the record, and I think the order on class certification is absolutely correct, and it was not an abuse of discretion by the district court to deny class certification. A couple minutes left. At this point, I don't have any further questions for the panel. If there's any questions, I'd be happy to entertain. My lack of discussion about class search shouldn't be construed as some sort of failure to dispute the propriety of class certification denial. I just wanted to use my time with the issue that was paramount. I think I would submit on the papers with respect to class certification, should the summary judgment motion be reversed. I want to start. I think Your Honor was on point when you mentioned the testimony of appellant's expert Berkowitz. And counsel's response to that was, oh, she doesn't really know what she's talking about. Well, that's weight. That's exactly what trial's for. No, I think his point was that when she testified that the RAI dietitians have, quote, no autonomy, that is a conclusory statement similar to those conclusory statements which under Iqbal and Twomley we are told in a pleading situation to ignore. So, I mean, if she had said there was some factual basis for showing that they did not have any autonomy, that there was a regulation that said that each person who has potassium deficit must eat a banana every day and nothing else, then there would be a basis to conclude there was no autonomy. Your Honor, she explained her testimony, and we quoted some of it on page 24 of our opening brief. It explains why there's no autonomy, because of the relationship with the attending physician and how the physician is the one that gives the patient's orders. Now, and this harkens back to the diet plan issue. The trial court or the district court itself on page 11 of its decision said, this cited testimony indicates that RIA doctors held responsibility over writing diet orders, ordering medication and approving these diet plans. So the physician does the diet order, yes. And then has to approve the diet plan that gets kicked out from the template, the computerized template, when you put in potassium levels are here, then it kicks out, okay, these are the kinds of foods they should eat. Bananas and spinach, they should increase bananas and spinach. And I think counsel made a point of the stage five, and I misspoke, I meant stage five renal patients, and I think we bring that up because it, I think they make a lot of points about how these people are critically ill, and it's true, they are. However, that doesn't mean you're more exempt. The case law and the statutes bear out that just because your negligence could result in a grave loss doesn't make you exempt. A school bus driver whose negligence can result in a great loss, but that doesn't make her exempt. Counsel, I want to return to this issue of the expert. I'm not sure if I understand how your, how you indicate that statements are not conclusory. Tell me how they are not. No, that is conclusory, because that's her conclusion, her opinion. And experts can give conclusory opinions, but they have to have foundation for it. And I was just simply explaining that on page 24 and in the ER at 123 to 6, she details the foundation for her opinion, her conclusion that they lack the autonomy in performing these duties, that these duties, you know, they execute the plan that is approved by the physician. And so that's the point I was trying to make. And I think it's important that, yeah, cases are often decided on summary judgment by the battle of the experts. I mean, that's, and it's the jury's province to resolve that dispute. And if he convinces the jury that my expert doesn't know what she's talking about, then that goes to wait. And the jury can follow his expert and not mine, but that's a jury question. And I just want to address these two decisions. I'm only aware of them because my office worked on them. I wasn't personally involved in the appellate process. And they're entirely different professions. And you don't evaluate one profession by looking at another one. And I think it's just important that we keep in mind that these statutes are narrowly construed. I don't know how many times courts have said it, but it's important that in practice they're narrowly construed, because they serve important policies for the state. They encourage both people to be employed. They encourage people not to work long hours. And if they do, they're compensated for it. And that's what my client was here for. Thank you very much.
judges: Fernandez, Bea, Mendoza